UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF ALABAMA

IN RE:

LAWRENCE J. HALLETT, JR.,　　　　　　　　　　　　CASE NO. 04-15471-WSS

　　Debtor.　　　　　　　　　　　　　　　　　　　　Chapter 7

---

CAROL J. EARHEART,

　　Plaintiff,

v.　　　　　　　　　　　　　　　　　　　　　　　　ADV. PROC. NO. 05-01026

LAWRENCE J. HALLETT, JR.,

　　Defendant.

## ORDER ON COMPLAINT

　　Marion E. Wynne, Jr., Counsel for Carol J. Earheart
　　Bert P. Noojin, Counsel for Carol J. Earheart
　　Jay M. Ross and Alexander Almond, III, Counsel for Lawrence J. Hallett, Jr.
　　Thomas E. Harrison, Counsel for Lawrence J. Hallett, Jr.

　　This matter came on for hearing on the Plaintiff's complaint to determine dischargeability of a debt pursuant to 11 U.S.C. §523(a)(2), (4) and (6). The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Order of Reference of the District Court. This matter is a core proceeding pursuant to 28 U.S.C. §157(b)(2). After due consideration of the pleadings, evidence, testimony and arguments of counsel, the Court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

　　The Debtor, Lawrence Hallett, Jr. ("Hallett"), is an attorney with thirty-one years

1

Case 05-01026　　Doc 83　　Filed 11/09/06　　Entered 11/09/06 15:50:18　　Desc Main
Document　　Page 1 of 19

experience specializing in domestic relations law in Mobile, Alabama. Hallett hired Dwight Bowman, an accountant by training, to assist with bookkeeping in his law practice. Bowman also had extensive computer skills. Prior to working for Hallett, he was convicted of bankruptcy fraud and theft by deception. Bowman is currently under indictment for theft of property in Baldwin County, Alabama. He suffered a stroke in 2005 and another mild stroke in February 2006. As a result, he has difficulty walking and memory problems. Bowman testified that he has no independent recollection of working in Hallett's office or Earheart's case.[1] Hallett knew that Dwight Bowman was a convicted felon[2] when he hired him to work in his office; however, Bowman had come to Hallett with recommendations from another attorney.

In September 2000, Hallett spoke with J.D. Morrow ("Morrow"), an attorney representing Carol J. Earheart ("Earheart") in a contested divorce proceeding.[3] Morrow asked Hallett as a more experienced attorney to assist him with Earheart's divorce action, which was set for trial at the end of September 2000, less than a month away. Morrow was not able to adequately prepare for the divorce trial because Earheart could not afford the expense of discovery.

On or about September 5, 2000, Hallett met with Earheart and Morrow at his office. Earheart wanted Hallett to become lead counsel in the divorce proceeding. Hallett informed Earheart that he would require a $25,000.00 retainer to represent her. She told him that she

---

[1] Bowman can remember the distant past, like his childhood, but not the recent past. He takes many medications, including medication for memory loss. He is able to drive and unload his wheel chair without assistance. He maintains a home office equipped with computers.

[2] Hallett eventually learned that Bowman stole funds from his practice while Hallett was being treated for cancer.

[3] Prior to Morrow's representation, Earheart had been represented by Mobile attorney Jerry Pilgrim.

presently did not have the money to pay him, but would have assets after the divorce was final. Hallett then offered to represent her for a flat fee of $100,000.00. Earheart initially refused to pay the fee and left Hallett's office. She returned on or about September 18, 2000, and signed a retainer agreement and a promissory note. Under the terms of promissory note, Earheart agreed to pay Hallett $100,000 with interest from September 15, 2000 at a rate of 12% per annum. The note also states: "This Note is secured by Any and All Real Estate or Personal Property in which Carol Jean Earheart has an interest in or receives an interest to as a result of any court action which she is a party. [sic], dated September 15, 2000."

Earheart's divorce action was a complex proceeding on many levels. Earheart and her ex-husband, Joel Earheart, owned a successful trucking business, Dolphin Trucklines, and had substantial assets, including two homes on Mobile Bay. The custody of the Earhearts' two minor children was also an issue. Earheart was concerned about retaining custody of her minor children, and about how she would receive a share of the family business, which was valued at approximately $ 5-6 million. The couple also had real property assets worth approximately $1 million. There were cross allegations of domestic violence. Joel Earheart alleged that Earheart had embezzled funds from one of the companies. There were also allegations that Earheart had criminal charges pending against her related to worthless checks written to a Mississippi casino.

The case involved over 10,000 documents held by Mr. Earheart's attorney, Claude Boone. Hallett reviewed the documents 2,000 to 3,000 at a time. After accepting the case, Hallett spent the majority of his time preparing for trial. Dwight Bowman assisted Hallett with computer research to find Mr. Earheart's business and real property holdings. Hallett took no new cases in his office during the month that he prepared for trial; he lost the revenue from those

3

cases four to six months later. Hallett also advanced all expenses for the trial, purchasing copies of Mr. Earheart's voluminous business records. During his years in practice, the largest fee that Hallett charged a client for a divorce proceeding was $50,000. He also charged a client $25,000. Earheart's $100,000 fee was the most he ever charged. Katherine Sikovic, Hallett's legal secretary, testified that she had never known Hallett to charge anyone $100,000 for a divorce proceeding.

Earheart testified that she and Hallett discussed his representation for two cases: the pending divorce action; and a civil action for assault against Joel Earheart based on a criminal charge of domestic violence. The civil action would be filed separately from the divorce case, but in conjunction with the divorce action, so that a ruling in the divorce case would not have res judicata effect on the civil assault action. Hallett testified that he did discuss the civil action with Earheart, but explained to her that he did not handle these types of cases. He offered to help her find an attorney who would handle the case. Hallett contacted another Mobile attorney, Skip Brutkiewicz, about the civil action. At an informal meeting with Earheart and Hallett, Brutkiewicz told Earheart that he would not represent her in the civil action without a signed fee agreement. Earheart never signed a fee agreement with Brutkiewicz to handle the civil action; however, he drafted an amended complaint for the civil action which was filed under Hallett's name. Morrow testified that Hallett explained to Earheart that he would handle the divorce action for a flat fee of $100,000, but that he would not handle the civil action against Mr. Earheart. Morrow also testified that Hallett explained the terms of the promissory note to Earheart. Morrow testified that he knew that Skip Brutkiewicz would be asked to handle to the civil action.

4

Case 05-01026    Doc 83    Filed 11/09/06    Entered 11/09/06 15:50:18    Desc Main
Document      Page 4 of 19

Earheart testified that when she signed the retainer agreement and promissory note with Hallett, she believed the $100,000 fee was for the civil action only and not the divorce proceeding. She understood that Hallett would obtain his fee for handling the divorce proceeding from an award from the judge in the divorce judgment and that her ex-husband would pay the fee. In a statement taken in a prior court proceeding[4], Dwight Bowman testified that Hallett informed Earheart that the $100,000 would be for both the divorce action and the civil case. Bowman did not reveal this information in a deposition previously taken in the same case.

At trial, Earheart initially denied signing the promissory note, but later testified that she did not remember signing the promissory note. She testified that Hallett did not explain the terms of the note to her. In a deposition from a prior court proceeding, Earheart confirmed her signature on the promissory note. When asked at trial if she lied about signing the note in the prior proceeding, Earheart testified that she had to lie because her counsel in the previous action told her not to dispute the signature on the promissory note.[5] However, Earheart still maintains that she does not remember signing the promissory note. She testified in a prior proceeding that she briefly read over the first pages of the retainer agreement before she signed it, but did not read it completely. She does not recall seeing the promissory note until January 12, 2001, at the closing of the sale of her home. Earheart hired a handwriting expert in the prior court proceeding

---

[4]James Bodiford is a Mobile attorney who represented Earheart in state court action against Hallett and Morrow. Bodiford came to believe that Dwight Bowman was a central figure in Earheart's claims against Hallett. Bodiford took a sworn statement from Bowman. The statement was taken after Bowman gave a sworn deposition for the state court action.

[5]Bodiford, Earheart's attorney in state court action against Hallett and Morrow, testified emphatically that he did not instruct Earheart to lie or deceive anyone during her deposition or at any other time.

to determine whether the signature on the promissory note was her signature. Her own expert determined that Earheart did sign the promissory note.

Hallett was not present when Earheart signed the promissory note and retainer agreement. Hallett testified that he does not remember going over the terms of the retainer agreement and the promissory note, but that he typically did explain the terms of an agreement to his client. He also did not draft the retainer agreement or promissory note. They were forms that Dwight Bowman obtained from another attorney's office. Hallett testified that he believed that the promissory note gave him a perfected lien on Earheart's real property. Sikovic signed the promissory note as a notary, but she did not see Earheart sign the instrument. Bowman brought the note to her, told her that Earheart had signed it, and asked her to notarize the document.

After Earheart signed the retainer agreement, Hallett obtained a continuance of the divorce trial to October 13, 2000. In preparation for the trial, Earheart spent three to four hours each day with Dwight Bowman. Hallett represented Earheart at the two day trial. The domestic relations judgment entered a judgment and divorce decree on November 7, 2000. Earheart was not satisfied with the outcome of the trial. She did not receive an award for alimony. She did receive $1,500 per month for child support for her two children. In the division of assets, she received the homeplace and another home located on Mobile Bay, with a total fair market value of $1 million. One of the homes had a $400,000 mortgage, for which Earheart was responsible. The court awarded Hallett $5,000 toward a reasonable attorney fee to be paid by Mr. Earheart. On December 7, 2000, Hallett filed a Rule 59 motion seeking to have the judgment amended; however, the domestic relations court only amended a provision requiring Mr. Earheart to pay the mortgage on one of the homes until December 2000. The civil assault case was dismissed later

6

for failure to prosecute. After Hallett withdrew from the case in January 2001 at Earheart's request, she could not find another attorney to handle the case.

Earheart decided to sell one of the houses that she received under the divorce decree. She entered into a contract to sell the property and the closing was scheduled for January 12, 2001. Because Mr. Earheart did not convey the real property to Mrs. Earheart as required by the divorce decree, Earheart had to obtain a clerk's deed to have the property placed in her name. Shirley Harley of Surety Title was to close the sale of the real estate. Harley contacted Hallett requesting the deed transferring the property to Earheart be recorded so that the closing could proceed. Harley is now deceased, but prior to her death, she gave an affidavit which indicates that she received a copy of the Clerk's deed the day before the closing. Harley recounted her dealings with Hallett as follows:

> When the Earheart to Bosarge closing was scheduled, I was told that a Circuit Clerk's deed for the subject property was in the possession of Lawrence Hallett, Ms. Earheart's divorce attorney. On January 11, 2001, I contacted Mr. Hallett to obtain the deed in order to prepare the closing documents for the Earheart to Bosarge closing. Mr. Hallett provided me with a copy of that deed and a copy of a promissory note, which he stated evidenced a claim against the property for $110,942.78, representing his fee, plus interest.

William Kahalley, owner/president of Surety Title, stated in an interrogatory answer that Shirley Harley, the closing agent for Earheart's property, called Hallett because the deed transferring the property to Earheart had not been recorded. According to Kahalley's answer,

> Mr. Hallett informed Ms. Harley that he had retained the deed transferring title to the Plaintiff [Earheart] as security for the attorney fees owed to him by the Plaintiff. Ms. Harley informed Mr. Hallett that Surety needed for the deed to be recorded, in order to complete the closing of the sale of the property. Mr. Hallett agreed to do so, but he then informed Ms. Harley that he claimed a lien on the subject property through a promissory note executed by the Plaintiff, and he demanded payment of the amounts claimed.

7

Kahalley testified that although he was not present at the closing and was not personally involved in the closing, he answered the interrogatories based on information from the business records. The closing was accomplished on the date scheduled and was not continued to another date. Hallett testified that he did not fax a copy of his fee invoice to Surety Title for the closing of Earheart's property, and he does not know who faxed the copy from his office. Hallett also said that he did not prepare the clerk's deed for the property or deliver it to Surety Land Title or to Earheart. He assumes Dwight Bowman drafted the document and delivered it to Surety. He does not know why the date for the sale in the clerk's deed - June 28, 2000 - is incorrect. The promissory note was recorded in the Probate Court of Mobile County, Alabama on January 12, 2001, but the exact time was not listed on the document.

Earheart testified that she never received a billing statement from Hallett. The first time she saw a statement was at the closing for the sale of her home. Earheart first learned that Hallett would receive his fee from the proceeds of the sale of her home when her real estate agent, John Hopkins, faxed her a copy of the closing statement on January 12, 2001. She became upset when she realized that the fee was being taken out and initially refused to attend the closing. Hopkins convinced her to attend the closing, and try to have the funds put into escrow until the dispute could be resolved. At the time of the closing, Earheart believed that she was two payments behind on the mortgage and was in danger of losing the home to foreclosure. Hopkins also told her that the buyers could take legal action against her for not fulfilling the contract to sell. Earheart testified that she signed the closing documents based on these fears, but disputed that Hallett's fee should be paid from the proceeds of the sale. Earheart called Hallett from the closing and asked him why the fee was being taken from the proceeds. In a heated conversation,

8

she explained to him that she thought his fee for handling the divorce would be paid through the court by her husband, and that the $100,000 fee was to handle the civil action. John Hopkins testified that he and Earheart asked that the disputed funds for Hallett's attorney fees be put into escrow until the dispute could be settled. According to his testimony, they learned that this was not possible because the funds for the disputed fee had already been disbursed. Hopkins said Earheart believed that she was behind in her mortgage payments on the day of the closing. Hopkins remembers that the deed was not at the closing. He remembers talking to a man at Hallett's office who told him that the deed would not be delivered until Hallett received the money for his fee.

Earheart reviewed Hallett's statement of services. She does not believe that Dwight Bowman spent the number of hours listed on the statement. The total bill for Hallett's services was $130,235. He was paid $110,942.78 from the proceeds from the sale of her property, so Earheart still owes Hallett approximately $22,000.[6] She has not paid him any of the balance of the fees. Earheart testified that she never gave permission for a lien to be placed on her property and did not give Hallett a mortgage on the property sold.

Hallett testified that he did not withhold the clerk's deed until his attorney fee was paid, and did not direct anyone in his office to withhold the deed until payment of his fee. He also did not tell Shirley Harley that he would hold the deed until he received his fee. Bowman testified in his sworn statement that Hallett told him that he was holding the Clerk's deed until the closing of Earheart's property.

---

[6]Hallett testified that his fee agreement called for a flat fee of $100,000 plus an hourly fee for paralegal expenses.

Hallett remembers receiving a call from Surety several days after the closing telling him to pick up the check for his fee. He did not receive the check on the date of the closing. Brandon Lee worked as a secretary in Hallett's office from August 2000 to approximately February 2001. Although she does not recall the exact date, she recalls that Hallett received the call from Earheart about having his fee withheld from the sale of her property on the same day that Hallett picked up the check from Surety. She remembers Hallett and Bowman being excited about getting the check from Surety. Lee did not remember when Hallett deposited the check.

Hallett stated that he never had an agreement with Surety that he would have his fee paid to him before any funds from the closing would be released to Earheart. Hallett testified that Morrow was paid $25,000 as co-counsel, not a referral fee, because Morrow assisted in reviewing Mr. Earheart's business records and preparing for trial. Morrow testified that his main duty was to handle Earheart and make sure that she showed up for meetings and for trial. He testified that he did not review most of the business documents produced by Mr. Earheart. He stated that he probably spent about ten hours a week on the case after Hallett took over. Morrow testified that the 25% of the fee that he received was a referral fee. Morrow later surrendered his license to practice to the Alabama State Bar in 2003 to undergo drug rehabilitation.

## CONCLUSIONS OF LAW

Earheart's complaint contains allegations of conversion, misrepresentation and fraud or defalcation while acting as a fiduciary. She further alleges that the debts arising from Hallett's alleged misconduct is nondischargeable pursuant to §523(a)(2)(A), (a)(4) and (a)(6). The credibility of the testimony offered to prove this case makes it unusual. Earheart, the party alleging the wrongdoing by the debtor, denied that the signature on the promissory note at issue

10

Case 05-01026    Doc 83    Filed 11/09/06    Entered 11/09/06 15:50:18    Desc Main
Document      Page 10 of 19

was hers, and then testified that she lied under oath in a prior court proceeding and admitted signing the note based on the advice of her counsel. Dwight Bowman, a key player in the events surrounding the complaint, is a convicted felon and now, due to a stroke, suffers memory loss during the trial of this matter. Mr. Morrow, Earheart's attorney, lost his license to practice law due to substance abuse. Finally, the defendant, Hallett, an attorney with thirty years of experience, testified that he believed that the promissory note signed by Earheart, with no mortgage or other recorded lien, gave him a perfected security interest in Earheart's property.

There was considerable testimony involving Hallett's conduct, the amount of fees charged, and the services he performed. Earheart questioned his professional judgment regarding his reliance on an employee whom he knew to be a convicted felon, and the extent of supervision over that employee, especially as it related to Earheart's case and the collection of his fees. However, the scope of the Court's inquiry must be limited to the issues of whether certain debts of Hallett are nondischargeable. While the Court has pointed to credibility issues regarding both parties, as well as certain witnesses called on their behalf, the Court must look to the evidence it has and determine whether Earheart has met her burden of proof for each cause of action in her complaint. With this backdrop, the Court will address each category of allegations and the applicable Bankruptcy Code sections alleged by Earheart.

## I. **CONVERSION**

Counts one and two of Earheart's complaint allege that Hallett converted approximately $111,000 in proceeds from the sale of Earheart's home, and the deed and real property itself by failing to deliver the Clerk's deed to Earheart. The counts further allege that the debts created from the conversion are nondischargeable pursuant to §523(a)(2)(A), (a)(4) and (a)(6).

11

Alabama law defines conversion as "a wrongful taking or wrongful detention or interference, or an illegal assumption of ownership, or an illegal use or misuse." *Ex parte Anderson*, 867 So.2d 1125, 1129 (Ala. 2003) quoting *Ott v. Fox*, 362 So.2d 836, 839 (Ala. 1978). Bankruptcy courts have recognized that "'[w]illful and malicious injury [under 11 U.S.C. §523(a)(6)] includes willful and malicious conversion, which is the unauthorized exercise of ownership over goods belonging to another to the exclusion of the owner's rights.'" *Matter of Dupree*, 197 B.R. 928, 936 (Bankr. N.D. Ala. 1996) quoting *Thomas Shelton v. Steering Federal Credit Union*, 191 B.R. 893, 895 (Bankr. N.D. Ala. 1995).

The evidence before the Court does not support a finding of conversion. First, Hallett did not have possession or control of the $111,000 at issue; Surety Title held the funds and paid them to Hallett only after Earheart signed the documents authorizing the sale of her property and payment of Hallett's claim. The funds were paid to Hallett only after Earheart gave her permission, albeit reluctantly, for Hallett to receive the funds. Even though Hopkins, Earheart's realtor, testified that he thought the funds were disbursed before the closing, there was no corroborating evidence or documents, and the Court does not believe that Surety Title disbursed over $100,000 prior to closing of the sale. Earheart testified that she felt she had no choice but to go through with the sale of the property because she feared foreclosure and the possibility that the buyers would bring an action against her for failing to close. However, there was no evidence that Earheart had received a foreclosure notice. Earheart's concern does not seem reasonable given the lack of such evidence. There was also no evidence that the situation with the buyers was so contentious that they would consider a lawsuit.

As to Hallett's conversion of the Clerk's deed, the Court again finds insufficient evidence

12

Case 05-01026    Doc 83    Filed 11/09/06    Entered 11/09/06 15:50:18    Desc Main
Document      Page 12 of 19

of conversation. Earheart alleges that Hallett held the deed until he received the funds for his attorney fee. William Kahalley, owner/president of Surety Title, stated in an interrogatory answer that Shirley Harley, the closing agent for Earheart's property, called Hallett because the deed transferring the property to Earheart had not been recorded. According to Kahalley's answer,

> Mr. Hallett informed Ms. Harley that he had retained the deed transferring title to the Plaintiff [Earheart] as security for the attorney fees owed to him by the Plaintiff. Ms. Harley informed Mr. Hallett that Surety needed for the deed to be recorded, in order to complete the closing of the sale of the property. Mr. Hallett agreed to do so, but he then informed Ms. Harley that he claimed a lien on the subject property through a promissory note executed by the Plaintiff, and he demanded payment of the amounts claimed.

Kahalley testified that although he was not present at the closing and was not personally involved in the closing, he answered the interrogatories based on information from the business records. Shirley Harley was deceased as of the date of the trial of this matter, but she gave an affidavit in support of a summary judgment in a previous state court action between Carol Earheart and Surety Title. Harley recounted her dealings with Hallett as follows:

> When the Earheart to Bosarge closing was scheduled, I was told that a Circuit Clerk's deed for the subject property was in the possession of Lawrence Hallett, Ms. Earheart's divorce attorney. On January 11, 2001, I contacted Mr. Hallett to obtain the deed in order to prepare the closing documents for the Earheart to Bosarge closing. Mr. Hallett provided me with a copy of that deed and a copy of a promissory note, which he stated evidenced a claim against the property for $110,942.78, representing his fee, plus interest.

While Kahalley's answer to interrogatories suggests that Hallett intended to hold the deed until he received the funds for his fees, Harley's account of her conversations with Hallett do not give the same impression. Harley had direct contact with Hallett and attended the closing; therefore, the Court gives greater weight to her statement.

13

Another fact that belies an attempt by Hallett to convert the Clerk's deed is the timing involved in obtaining the deed and the closing. The clerk's deed is dated January 11, 2001, one day before the closing on January 12, 2001. Harley's affidavit states that Hallett provided her with a copy of the deed. Since the sale closed on January 12, 2001, the date that it was scheduled to close, it is apparent that Hallett did not convert the deed and cause damage to Earheart. Based on the foregoing, the Court finds that the relief sought regarding conversion in counts one and two under 11 U.S.C. §523(a)(2)(A), (a)(4) and (a)(6) should be denied.

## II. MISREPRESENTATIONS

Earheart alleges misrepresentations by Hallett regarding two incidents: (1) the terms of his employment and the promissory note he required for employment, and (2) Hallett's representations to Surety Title and its agents that he had a valid lien on Earheart's property. Under 11 U.S.C. §523(a)(2)(A), the debtor is not entitled to discharge for a debt for money or property to the extent obtained by "false pretenses, a false representation, or actual fraud, . . .". To prevail under § 523(a)(2)(A), a creditor must show that: (1) the debtor made a representation; (2) at the time, the debtor knew the representations were false; (3) the debtor made the false representations with the purpose and intention of deceiving the creditor; (4) the creditor justifiably relied on the representations; and (5) the creditor sustained a loss as a result of the representation. *Field v. Mans*, 516 U.S. 59, 70-71 (1995); *In re Meyer*, 296 B.R. 849, 858 (Bankr. N.D. Ala. 2003). The standard of proof for such a claim is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279 (1991).

As to Hallett's representations to Earheart regarding his employment, the evidence is conflicting and unreliable. Earheart maintains that Hallett agreed to handle both her divorce

Case 05-01026   Doc 83   Filed 11/09/06   Entered 11/09/06 15:50:18   Desc Main
Document      Page 14 of 19

action and the civil action against Joel Earheart. The retainer agreement and the promissory note for $100,000 was to be payment for the civil action. Hallett would be paid for his work on the divorce action from an award from the domestic relations court. Bowman's sworn statement corroborates Earheart's account, but his status as a convicted felon and his failure to mention this fact in his previous deposition lead the Court to discount his testimony. Hallett states that he discussed the two cases with Earheart, but told her that he did not handle civil cases and would help Earheart obtain an attorney to handle that action. He maintains that the $100,000 was a flat fee for handling the divorce action. Morrow agrees with Hallett's version of the meeting.

The Court observed Earheart's demeanor at trial during her testimony and did not find her credible. Her testimony that she previously lied under oath supposedly at her attorney's instruction regarding her signature makes the Court wary of accepting her testimony at face value. In addition, she persisted in denying that she signed the promissory note even though her handwriting expert identified the signature as her signature. Her testimony does not correspond with that of Mr. Brutkiewicz who testified that he met with Hallett and Earheart about representing Earheart in the civil case. If Earheart believed that Hallett was handling the civil case for $100,000, she must have wondered why Hallett arranged a meeting with Brutkiewicz. Although Hallett and Morrow agree on the terms of employment that were offered to Earheart, the Court has reason to mistrust their account since they differed in their recollection as to whether Morrow was paid on a contingent referral fee or as co-counsel. They also had different versions of whether Hallett explained the terms of his representation to Earheart. Hallett testified that he did not remember going over the terms of the promissory note and retainer agreement, although he routinely would go over the terms of the agreement with a client. Morrow says

15

Hallett did explain the terms of the documents. There was much testimony about whether Hallett charged any other domestic relations client such a large fee for his services, but the propriety of Hallett's $100,000 fee for a divorce action is not an issue before this Court. The burden of proof was Earheart's to show that Hallett make the misrepresentations. Based on the foregoing, the Court finds that Earheart failed to prove that Hallett misrepresented the terms of his employment and the $100,000 fee.

Count five of Earheart's complaint alleges that Hallett's representation to Surety Title that he had a valid lien against Earheart's property caused damage to Earheart. Under the elements of §523(a)(2)(A) listed above, there is no question that Hallett represented to Surety Title that he had a valid lien. Hallett testified that he believed that he had a valid lien on Earheart's property based on the promissory note. Given Hallett's legal education and years of experience as an attorney, such testimony undercuts his credibility with the Court. Nevertheless, even if the Court assumes that Hallett knew this representation was false and intended to deceive Surety, the evidence clearly shows that Earheart, the plaintiff in this case, did not justifiably rely on Hallett's representations. Earheart did not accept Hallett's lien and vehemently denied that he had a valid lien. She did not rely on Hallett's misrepresentation, justifiably or otherwise, and agreed to proceed with the sale of the property knowing Hallett's fee would be deducted.

Hallett's representations were made to Surety Title. Again assuming that Hallett knowingly misrepresented the existence or validity of his lien to Surety and assuming an agency relationship between Earheart and Surety Title, the Court finds that Surety did not justifiably rely on Hallett's assertions. Justifiable reliance allows "a plaintiff to rely unequivocally on a representation or promise made by a debtor, without investigating the truth of the representation

16

or promise, unless the statement is patently false." *In re Meyer*, 296 B.R. 849, 862 (Bankr. N.D. Ala. 2003) citing *FCC National Bank v. Gilmore*, 221 B.R. 864, 874 footnote 10 (Bankr. N.D. Ala. 1998). The Supreme Court explained that justifiable reliance turns "'upon an individual standard of the plaintiff's own capacity and the knowledge which he has, or which may fairly be charged against him from the facts within his observation in light of his individual case.'" *Field v. Mans*, 516 U.S. at 72 quoting W. Prosser, Law of Torts §108, p. 717 (4th ed. 1971). Surety Title is a title company and is in the business of closing real estate transactions. Surety Title knows the requirements for a valid, perfected lien and the importance of assessing the validity of a lien. The evidence shows that Hallett or someone in his office faxed a copy of the promissory note to Surety Title shortly before Earheart's closing. Surety Title had the opportunity to check the real property records to determine whether the lien was valid and perfected. It is not disputed between the parties that the promissory note signed by Earheart failed to create a valid perfected lien on her real property. Based on the evidence, the Court finds that Earheart did not rely on Hallett's representation and any reliance by Surety Title on Hallett's representations that he had a valid lien on Earheart's property was not justifiable. Therefore Earheart did not prove the elements of §523(a)(2)(A) as alleged in count four and five of her complaint.

### III. FRAUD OR DEFALCATION WHILE ACTING IN A FIDUCIARY CAPACITY

Section 523(a)(4) provides that a debt derived from "fraud or defalcation while acting in a fiduciary capacity, embezzlement or fraud" is nondischargeable. 11 U.S.C. §523(a)(4). To have a debt declared nondischargeable under this section, a creditor must show that (1) the debtor was acting in a fiduciary capacity; and (2) the debtor committed an act of defalcation while acting in

17

such capacity. *Clark v. Allen (In re Allen)*, 206 B.R. 602, 605-06 (Bankr. M.D. Fla. 1997). The issue of whether the debtor was acting in a fiduciary capacity is governed by federal law. *Id*. at 606. The common perception of a fiduciary relationship is one involving "confidence, trust and good faith." *United Food and Commercial Worker's Union Local 1995 v. Eldridge (Matter of Eldridge),* 210 B.R. 188, 192 (Bankr. N.D. Ala. 1997). "Federal courts have found this definition 'to be far too broad' for purposes of §523(a)(4) and have limited the scope of the term fiduciary to include express and technical trusts." *Eldridge*, 210 B.R. at 192. The *Eldridge* court quoted Judge Mahoney in *Freeman v. Frick (In re Frick)*, 207 B.R. 731, 734 (Bankr. S.D. Ala. 1997):

> The narrow interpretation of fiduciary with the broad interpretation of defalcation ensures that the window of liability opens infrequently. Only trustees with entrusted funds in clearly defined trusts are covered. . . . [C]ourts have consistently held that to be a fiduciary for purposes of dischargeability, the debtor must be a trustee under either an express or technical trust rather than a trust imposed ex-maleficio. The distinction, then, between an express trust and a trust imposed ex-maleficio is that an express trust comes into existence prior to the act of wrongdoing from which the debt arose. A trust imposed ex-maleficio, on the other hand, springs from the very act of wrongdoing and is applied constructively as a remedy for wrongdoing to prevent unjust enrichment.

*Eldridge*, 210 B.R. at 192. Even in the case of an attorney-client relationship, there must be an express or implied trust before §523(a)(4) is implicated. See *Clark v. Allen (In re Allen)*, 206 B.R. 602, 607-08 (Bankr. M.D. Fla. 1997) (holding that a state court finding of an attorney-client relationship between a debtor and a creditor and professional negligence did not "closely mirror" the requirements of §523(a)(4) for collateral estoppel purposes).

Earheart alleges in count three of her complaint that Hallett committed an act of defalcation while acting in a fiduciary capacity by receiving the $111,000 from the proceeds from

18

the sale of her home and by refusing to deliver the deed to the closing agent. Earheart failed to prove the elements of §523(a)(4). There was no evidence that Hallett held the $111,000 from the sale of her home in an express or technical trust. As noted above, a trust ex-maleficio, resulting from a wrongful act cannot be the basis for recovery under §523(a)(4). The Court has previously found that Hallett did not withhold the deed from Earheart or Surety Title. In finding that §523(a)(4) does not apply to Hallett's actions, the Court does not condone his action toward his client Earheart. Regarding the issues before this Court, the Court finds that the relief sought in Earheart's complaint in Counts One through Five should be denied. It is hereby

**ORDERED** that the relief sought in Earheart's complaint under 11 U.S.C. §523(a)(2)(A), (a)(4) and (a)(6) is **DENIED**, and a judgment shall be entered in favor of the Defendant, Lawrence J. Hallett, Jr., and against the Plaintiff, Carol J. Earheart.

Dated: November 9, 2006

WILLIAM S. SHULMAN
CHIEF U.S. BANKRUPTCY JUDGE